STATE, Plaintiff-Appellee, v. GLAROS, Defendant-Appellant.

Ohio Appeals, Seventh District, Mahoning County.

No. 4028.   Decided March 7, 1961.

*Mr. Thomas A. Beil,* prosecuting attorney, and *Mr. Elwyn V. Jenkins,* assistant prosecuting attorney, for plaintiff-appellee.

*Mr. William A. Ambrose* and *Russell G. Mock,* for defendant-appellant.

(SKEEL, J., of the Eighth District, DOYLE and HUNSICKER, JJ., of the Ninth District, sitting by designation in the Seventh District.)

For further history see *Omnibus Index* in bound volume.

SKEEL, J. This appeal comes to this court on questions of law from a judgment and sentence entered on the verdict of a jury. The indictment charges the defendant with the crime of embezzlement in violation of Section 2907.34, Revised Code. It is alleged in the indictment that on the 8th day of July, 1957,

William Glaros "did aid and abet John Tobin, Jr., an employee of The American Automobile Insurance Co. * * * in embezzling and converting to his own use the personal property of the aforesaid * * * insurance company * * *, the employer of the aforesaid John Tobin, Jr., and without the assent of any owner or owners of said property, the said William Glaros did aid and abet John Tobin, Jr., in the conversion and embezzlement of certain money of the value of fifty-six thousand two hundred thirty-one dollars and twenty-one cents ($56,231.21) which then and there had come into the possession of the aforesaid John Tobin, Jr., by virtue of his employment * * * with said insurance company * * *."

The facts are not in great dispute. John Tobin, Jr., was an employee of the American Automobile Insurance Company as alleged in the indictment. He was the claims adjuster in the Youngstown area. Sometime prior to and through the year 1957, Tobin, with others, developed and carried on an unlawful enterprise by presenting false claims for damage under insurance contracts of his employer and divided the money collected among those associated in the unlawful scheme.

The manner in which the division of the money taken in such fraudulent enterprise was made or the amount received by each of the conspirators is not shown by the evidence. The money alleged to have been embezzled by the indictment was drawn from the funds of the insurance company (Tobin's employers) by drafts signed by Tobin pretending to draw the money in the names of and to be paid directly to claimants to settle claims growing out of feigned accidents said to have been caused by the negligence of drivers of automobiles covered by insurance contracts written by Tobin's employer. The report of Tobin to his insurance company in the case here involved was an accident (which did not happen) reported to have occurred on July 8, 1957, involving a Buick automobile owned by Milo Tilocco, which was covered by an insurance contract with Tobin's employer. Ten claims were fraudulently presented (nine from non-existent persons) to the insurance company at its Cleveland office as having resulted from this alleged accident. The first draft in the sum of thirty-three hundred dollars ($3,300.00), signed by Tobin, drawn on the American

Associated Insurance Companies, payable to Donald Maslowski and Sylvia Maslowski, and appearing to be endorsed by them, was deposited to the account of Johnson Neville Co. in the Mahoning National Bank of Youngstown and paid out of the insurance companies' account in Cleveland by the National City Bank. Nine additional drafts in the same form with John Tobin, Jr., as maker, made payable to persons (said to be fictitious) but noted as those in the Milo Tilocco accident, and in some cases to Allen J. Swain, his attorney, as co-payee, and in most cases endorsed and deposited for collection by Swain, were also issued and paid in the total sum of over fifty-six thousand dollars ($56,000.00).

Tobin had several persons associated with him in the false claims enterprise, three of whom were Allen J. Swain, an attorney acting in that capacity, for false claimants, Paul Shade, who by his own testimony, worked at creating and carrying out false accident claims, and a Dr. James W. Barnes, Jr. All have pleaded guilty to embezzlement and are now in the penitentiary.

The evidence shows, during the entire period of time that this fraudulent enterprise was in progress, that is until about January 1, 1958, that Tobin was a man having an apparent good reputation in the community. He ran as a candidate for city councilman of Youngstown (to represent the Sixth Ward) in 1955, and although defeated in that campaign, he was nominated and elected to that office in the fall of 1957. He conducted an aggressive campaign, appearing on television and radio, distributed campaign literature (printed by the defendant), and appeared with the Mayor and other victors on a television program to celebrate his victory at the election. (November 1957.) Paul Shade was his campaign manager. He also ran a successful dairy store and was associated with other enterprises to the knowledge of the general public. He was, during this time, building a new home in an exclusive residential area in Youngstown (Millcreek), such building being financed by one of the leading banks of Youngstown, drove expensive automobiles, and was at least an interested party, with Shade, if not the owner, of an airplane.

Paul Shade testified that when he came to Youngstown in March of 1957 to engage with Tobin in the false insurance

claims enterprise, he "became prominent in business affairs." The evidence on this point was as follows:

"Q. As soon as you got into town, you started to become prominent in business affairs, didn't you?

"A. I guess you might say so.

"Q. That was so that for all intent and purposes you were legitimate?

"A. Yes.

"Q. So that you were successful with Tobin in selling the people of the Sixth Ward, you and Tobin were both legitimate?

"A. Yes.

"Q. As a matter of fact, you and Tobin had a business in the Sixth Ward, a legitimate business?

"A. Yes.

"Q. What was that?

"A. Newport Dairy Stores.

"Q. And that was a pretty fair little enterprise, wasn't it?

"A. Yes.

"Q. You had many friends in that locality?

"A. I believe so, yes sir."

The fact is that they were so well established as legitimate businessmen that when they fled while the investigation was in progress in December of 1957 and January of 1958, they were able in a few hours time to cash over nine thousand dollars in worthless checks from their many neighborhood "friends."

William Glaros, the defendant, was the proprietor of a printing establishment. He was engaged by Tobin to do certain printing. Some of the printing was for political purposes and some consisted of doctor's stationery and billheads, garage estimate sheets, hospital billheads and reports with one item consisting of an article about a three car automobile accident in which nine people (the accident did not happen) were reported injured, it being the order of Tobin that that article should be fitted into a page of the "Youngstown Vindicator" (a newspaper published in Youngstown). The story was prepared by Tobin to simulate the alleged Milo Tilocco accident above described. The defendant's account with Tobin shows that from April 28, 1955 until October 31, 1955, printing for political purposes was ordered by Tobin in the amount of two hundred

eighty-eight dollars and fifty-four cents ($288.54) and paid for by check. In 1956, four orders for statements (noted Shartin, Statler and Yarmy) and business cards showed on the account book of the defendant, amounting to $87.68, with credits in cash, totaling $53.56, the account ledger showing a balance of $33.12, carried over to 1957. The first transaction in 1957 shows credits by cash and check paid from January 4 to February 18, building a credit balance of $287.42. On March 12, charges amounting to $275.27 for "Xmas Cards," political cards, windshield stickers and letterheads were charged, leaving a credit balance of $12.15. From that time until December 31, 1957, about $2250.00 worth of printing was ordered, of which amount about $600.00 was for printing political materials. The rest shows (about $1700.00) that the charges were for doctor's stationery, billheads, hospital bill heads, reports, $75.00 of which was for the newspaper article, of which twelve copies were furnished. The doctors and hospitals noted on these charges in defendant's books are: Southside Unit (Hospital), Dr. J. D. B. (H. M. & B. W.), Dr. Dockry, Dr. Murray, Sofrance, Schultz, Tamarkin, Allman, Cook, McElroy, Emily Arnold (reporter), Carlson, Jones, Caldwell, Boniface, Burns, Mizlets, Galden, Peterson, Newsome, Angel, Frederick, Williams, J. Calla, Dunlap, Harma, and others. Some of these doctors were called as witnesses to say they had not authorized the printing furnished by the defendant to Tobin. There is no doubt that Tobin used some of this printing in carrying out his fraudulent purpose, but it is also an undisputed fact, taken from the state's evidence, that the defendant faithfully recorded every printing job ordered in his regular bookkeeping system and noted thereon the character of each item and the names just mentioned.

The state presented the testimony of Paul Shade (a coconspirator with Tobin) who, in part, testified in discussing the defendant's book account of their transactions:

"A. Jack Tobin, we were both wondering, I brought it up first to Jack.

"THE COURT: What did you say to the defendant?

"A. All right, I asked him about writing those entries on that ledger that was laying out there in the open, we didn't want anyone to see it. I didn't want anyone to see we were

ordering these various forms because I was afraid we might be detected that way.

"Q. Did Mr. Glaros at that time say anything to you concerning the ledger?

"A. He said, don't worry, no one will ever see it. You don't have to worry about anyone seeing that."

In carrying out the fraudulent scheme of securing payment of nonexistent damage claims covered by insurance contracts with Tobin's employer, several companies were created whose bank accounts were used in some of the financial manipulations. These companies were Johnson Neville Co., the name of Ralph M. Neville being the authorized signature to its bank account; Custom Automobile Sales and Service Company, the name of Jay Steinberg (one of the fictitious names used in the Milo Tilocco incident) being the recorded signature to this bank account; Do All Roofing and Sheet Metal Co., the name Al Rains being used on its bank account. Paul Shade testified that he signed the foregoing names in using bank accounts deposited under the company name indicated and that on two or three occasions, in payment to The Glaros Printing Company, he made out a check on one or more of these accounts in the presence of the defendant and that on one occasion, he (the defendant) remarked "Who are you today." Shade also testified upon a visit to the print shop that Glaros said:

"Q. At anytime when you first went there (printshop) in March, 1957, until you left, down in January, 1958, did Mr. Glaros ever make any remarks to you when you were ordering these various letterheads for the doctors and hospitals here in Mahoning County?

"A. You say did he make any statements?

"Q. Yes.

"A. One time is all I remember.

"Q. What did he say at that time?

"A. When I took about four or five in there and we had ordered quite a bit previously in the week preceding, he said you boys had better watch it—you are speeding.

"Q. I didn't hear you.

"Mr. Ambrose: You better watch, you are speeding.

"Q. You are speeding?

"A. Yes.

"*  *  *

"Q. When did he make the reference to automobiles?

"A. At election time in 1957. Just before election time in November.

"Q. What type of car were you driving then?

"A. I had a Cadillac.

"Q. What year?

"A. 1957.

"Q. What did Mr. Glaros say to you at that time?

"A. He said he wished he had an operation like ours so that he could drive and have a new Cadillac and three new cars, and that it looked like a nice racket.

"Q. Did you at any time—you were in and out of the Glaros office ever tell Bill Glaros or anybody working there that you were using any of this material you were having printed to defraud insurance companies?

"A. No sir.

"*  *  *

"Q. We come up to December 1957. You had known Bill Glaros from March, 1957?

"A. Yes sir.

"Q. To that time, did you ever pay him anything in a fraud case under the counter or anything otherwise that would indicate that you were in some illegal business of cheating anybody?

"A. I never paid him any money under the counter.

"Q. Did you at any time have any understanding or agreement or in Tobin's presence did he make any indication of any kind he had been paid additional to the usual course of business charge?

"A. No."

As has been indicated, the indictment charges Glaros with aiding Tobin in the crime of embezzlement. The defendant asked for and was furnished a bill of particulars which set out the following as the basis of the crime charged:

"1. That the Defendant, William Glaros, did print a fictitious page of 'The Youngstown Vindicator' describing a fictitious automobile collision alleged to have taken place at

the intersection of Salts Spring Road and Meridian Road in Mahoning County, Ohio.

"2. That the Defendant, William Glaros, did print various physicians' letterheads used by John J. Tobin in perpetrating the embezzlement.

"3. That the Defendant, William Glaros, did print various letterheads of hospitals, thereby aiding and abetting John J. Tobin in perpetrating the embezzlement.

"4. That the Defendant, William Glaros, did print letterheads and blue backing of a court reporter, which was used by John J. Tobin in perpetrating the embezzlement."

The defendant claims the following errors:

"1. The indictment and bill of particulars failed to state an offense and was therefore void.

"2. The Court erred in failing to place the prospective jurors under oath as required by the statutory law of Ohio and in failing to withdraw the jury when the same was called to his attention.

"3. The Court erred in the admission of incompetent and prejudicial evidence.

"4. The Prosecuting Attorney was guilty of misconduct in failing to call the witness, John Tobin, and in his closing argument to the jury.

"5. The Court erred in not discharging the defendant at the close of the evidence.

"6. The Court erred in refusing to charge the jury as requested before argument, erred in his general charge to the jury and in failing to properly charge the jury in response to the questions submitted during the deliberations by the jury.

"7. The verdict of the jury and judgment was against the manifest weight of the evidence and was contrary to law.

"8. The Court abused his discretion during the proceedings and was prejudicial towards said defendant thereby depriving said defendant of his constitutional right of having a fair and impartial trial."

This case was before the Court of Appeals at an earlier date when it affirmed assignment of error No. 1 and reversed the judgment of the trial court on the error set out as No. 2. However, upon appeal to the Supreme Court, the judgment

of the Court of Appeals was reversed and the cause remanded to this court to consider errors No. 3 to 8, inclusive.

That part of error No. 4, complaining of the prosecutor's closing argument, is well taken. The record discloses that the prosecutor said to the jury:

"Yes, Mr. Ambrose, Tobin is a thief, Shade is a thief and I say to you, ladies and gentlemen, from the evidence, you will find that Mr. Glaros is also a thief."

An objection was quickly made which the court did not rule on but passed the matter off as if such statement was made with the court's full approval. Tobin and Shade were not parties to this case. The state was required to establish beyond a reasonable doubt that Tobin was guilty of embezzlement before this defendant could be found guilty of aiding in the commission of the crime under the claims of the state as here presented. There was no controversy as to the identity of the persons involved so that unless Tobin's guilt was established in this case, this defendant could not be found guilty. The fact that he (Tobin) had pleaded guilty in another action could not be put in evidence unless by stipulation. To permit the prosecutor to say what is above quoted, with the court's approval, was clearly prejudicial. State v. Cloud, 168 N. E. 2d, 761.

The refusal to grant defendant's request to give special instructions to the jury before argument did not constitute error as claimed (Error No. 6). State v. Cheatwood, 84 Ohio App., 125, at 134, 82 N. E. 2d, 770, 15 Ohio Jurisprudence 2nd, page 744, para. 577. However, if such requests were proper and relevant to the issues in the case, they should have been incorporated in the general charge, and even if they were not proper in form but indicate a request for an instruction upon a subject relevant to the case, then the court must deal with that subject in its general charge. Wortenberger v. State, 99 Ohio St., 353, 124 N. E., 243, Felsman v. State, 45 Ohio App., 428, 187 N. E., 201. There were four requests presented. The first request for charge before argument dealt with the subject of how the jury should consider the testimony of an accomplice. This request was, in part, improperly drawn and should not have been given as presented. However, having made such request, the court was advised that a proper charge on that

subject was requested and a correct charge on that subject should have been included in the general charge. The court did charge on this question in its general charge. The court said:

"I think it is agreed in this case that Shade was convicted of aiding and abetting the crime charged against Tobin. He might, therefore, be called an accomplice of the defendant if he be found guilty. It depends on how you look at the evidence but in any event, *since he was an accomplice*, at least of Tobin, I shall give this additional instruction to you regarding his testimony. (This statement was highly prejudicial.) Emphasis added.)

"He is a witness, like any other witness, and you will apply the tests I have already given you with respect to his testimony but since he was an accomplice, it is your duty to scrutinize his testimony, carefully exercising your conscientious consideration in so doing. I do not mean that his testimony should be rejected because he is an accomplice, I simply mean that you give it particular attention by scrutinizing that testimony carefully. He is a witness the same as any other witness except that since he is a claimed accomplice, you will give his testimony particular attention in the manner I have just mentioned."

In the first place, it is not for the court, as was done here, to state that the witness is an accomplice of Tobin. Until Tobin is found guilty of embezzlement, under proper instructions in this case, and until the said Paul Shade is by like proof found guilty with Tobin in this case, under proper instructions, he could not be an accomplice of this defendant. And even then, the instruction that the jury should give his testimony "particular attention" could be understood to put emphasis on the value of his evidence. This part of the court's charge was clearly prejudicial to the rights of the defendant.

The second request encompassed the subject of "aiding" which correctly stated the law as requiring "the intentional giving of assistance." The court in its general charge, in attempting to define embezzlement, incorrectly stated the elements of the crime. The charge states first, that Tobin must have been an employee of the American Insurance Company,

second, that something of value came into his possession or under his control by reason of his employment, and third, that a part or all of that something of value, which came into his possession or control, was converted by Tobin to his own use or fraudulently taken by him or made away with by him. The statute defines embezzlement as follows: (Section 2907.34, Revised Code) * * * Whoever * * * "shall embezzle or convert to his own use, fraudulently take or make away with, or secrete with intent to embezzle or convert to his own use anything of value which comes into his possession by virtue of his election, appointment, or employment thereto." The charge then proceeded to set out the elements that must be established to prove the defendant's guilt by saying, first, "that the defendant did something which aided or assisted Tobin in the commission of that crime, and, second, that at the time of the doing of any such thing by defendant, the defendant was conscious of the fact or aware that what he did was of aid or assistance to Tobin in the commission by Tobin of any act which the law forbids, in other words, a crime." The court skillfully avoided the use of the word "intent" or to say that "intent" is an element of the crime of embezzlement or that the defendant must intend to aid in the commission of the crime charged against Tobin. That the indefiniteness of the charge on this subject was confusing to the jury is clearly brought out by their request for further instructions during deliberations. They wrote out their request which was as follows:

"Was the charge given us concerning Glaros just *aiding* Tobin or *knowingly* aiding Tobin."

The court answered the question by again stating: "* * * second, that at the time of doing any such thing, the defendant was conscious of the fact or was aware that what he did was of aid or assistance to Tobin in the commission by Tobin of an act which the law forbids, in other words, a crime."

The answer in the exact words of the general charge on the subject was, to say the least, equivocal. The defendant was entitled to have the jury instructed in plain language that "intent or purpose" to aid another in the crime of embezzlement is a basic and necessary element of the crime here charged against him and the court's refusal to so charge the jury constituted prejudicial error.

The third request to charge was on the subject of motive. This request was correctly drawn. The question of motive was completely omitted in the general charge. In a case where the claim of defendant's guilt is based on evidence, as this one is, which does not directly involve the defendant with the commission of the crime with which he is charged, namely aiding Tobin to embezzle his employer's property, except as such fact might be deduced from the printing of a great number of forms and letterheads of doctors and those used by hospitals at the instance of one other than the persons whose names were printed on the stationery, such printing being done in the regular course of the defendant's printing business, presumably at reasonable or regular prices where each transaction is correctly recorded on the books of the printing company, a consideration by the jury of the presence or absence of motive was, therefore, highly important to the defendant on his theory of the case. Under such circumstances, it was the duty of the court to charge on motive and the failure to do so on request constituted error. *Felsman* v. *State*, 45 Ohio App., 429, 187 N. E., 201. *Fabian* v. *State*, 97 Ohio St., 184, 119 N. E., 410.

The fourth request to charge was correctly stated and correctly given in the general charge.

The defendant's remaining claims of error, except No. 3, which we overrule, as not well taken or necessary to be here considered, involves the questions of the sufficiency of the evidence to establish that the defendant was an aider of Tobin in the commission of the crime of embezzlement and whether or not under the evidence Tobin committed the crime of embezzlement.

As to the first of these questions, the state must rest its case on the fact that the defendant printed certain doctor's stationery, bills or statements for one other than the doctor's involved and hospital forms used in recording medical facts in accident cases and by printing a reconstructed fictitious story of an automobile accident printed so as to look like it was carried in a Youngstown newspaper as a regular news item. The state must claim that by such conduct the jury could consider that the defendant thereby knowingly acted in aiding a scheme to defraud the employer of the man who ordered the printing. These facts standing alone might suggest guilty knowledge on the part of one familiar with adjusting accident claims for an insurance

company, but it would be difficult to attribute such knowledge to one with no experience in such work. There is no direct evidence in the record that the defendant had knowledge of the use to be made of the letterheads and forms. Going one step further, where the employee who ordered the printing was a man of good repute in the community and of sufficient standing to be elected councilman during the period of time that the printing was ordered and when, with the orders for doctor's stationery, there was a considerable amount of printing ordered for political purposes, under such circumstances, it requires considerable imagination to conclude that in printing such material, the printer knowingly became a co-conspirator to defraud the employer by an employee of good standing who ordered the work done and that the jury would be warranted in resolving the issues against the defendant beyond a reasonable doubt. Nor do the facts related, about the desire of Tobin not to let others see the defendant's books, setting out Tobin's orders or the defendant's statement about "better look out, you are speeding" and the like, clearly support such conclusions or strengthen the state's case. These facts are not necessarily detrimental to the defendant but could, in fact, be considered as demonstrating a complete lack of knowledge of wrong doing on the part of Glaros under all the surrounding circumstances. The acts of an aider must be shown to have been performed with knowledge of the fact that he was acting in furtherance of an unlawful purpose. Where what he does standing alone in furtherance of a completely lawful purpose, suspicion of the unlawful use of his product is not enough to make him an aider in a crime in which his printing was used. If this were the only error claimed, we would be compelled to reverse the judgment as not supported by the evidence.

In the case of *McLendon* v. *State*, 57 Tex. Crim. Rep., 617, 124 S. W., 637, it was held that where one sold ten bushels of peaches to a man who owned a still and apparently made brandy out of them and knew of the use to be made thereof, his conviction for violating the local option was reversed on the ground that he was not shown to be interested in making the brandy. See also *Smith* v. *State*, 41 Ohio App., 64, 179 N. E., 696.

We come finally to the question of whether or not, admitting all of the facts as to Tobin's methods of defrauding his employer, which are, in fact, not in dispute, the crime of embezzle-

ment is made out? The elements necessary to make out the crime of embezzlement, as charged in this case, are: 1) the relationship of employer and employee must be established; 2) The property embezzled (which was the property of the employer or another), came into the possession of such employee (the accused) by reason of such relationship; 3) The accused (the employee) after coming lawfully into the possession of such property, embezzled or converted such property to his own use; 4) With intent to embezzle or steal the same.

The element which is completely missing from the facts established is number two, that is, that the property embezzled came into the lawful possession of Tobin by reason of his employment. The facts on this question are likewise not in dispute. The employer of Tobin maintained a bank account in the National City Bank of Cleveland. The credit represented by this account was at all times the sole property of The North American Insurance Co. and in its possession. The fact that Tobin could draw some part of the funds to settle a particular case with the consent of the employer-depositor, transferred no part of the account to Tobin. The fact is that when a draft was accepted by the payee, under the clear and uncontroverted facts here presented, it was the intention of the parties to such transaction that the credit represented by the draft, if used as intended, was to become the property of the payee (claimant) when presented for payment. If the action of the payee (fraudulently designated) in accepting the draft was to procure the funds of his employer by fraud whereby the credit was, in fact, transferred to the control of the drawer, a trespass was clearly committed in acquiring possession of the amount of the draft by the drawer and the crime committed would be larceny by trick as defined by Section 2907.21, Revised Code, or obtaining money by false pretenses, as defined by Section 2911.01, Revised Code. In such case, each draft used, as here outlined, would constitute a separate crime.

There is not a scintilla of evidence in this record that the taking of the insurance companies' funds by Tobin was accomplished in the course of Tobin's authorized employment. In fact, the part that Tobin's employment by the insurance company played under the facts here presented was to enable

him to steal his employer's funds without immediate detection. One who commits a trespass in securing the possession of the property of another with intent to steal or convert the same to his own use commits larceny and not embezzlement. Tobin could not again convert money already in his possession, possession having been accomplished by illegal, fraudulent, or unlawful means constituting a trespass. The conversion or trespass in taking possession of the property of one's employer or another is not embezzlement nor can a thief be guilty of embezzlement by using the goods he possesses as a result of theft, even though he is an employee of the owner of the stolen goods. This has been the law since Pears case decided in 1780.

For the foregoing reasons, the judgment of the trial court is reversed and final judgment entered for the defendant.

DOYLE and HUNSICKER, JJ., concur.